**SQUIRE PATTON BOGGS (US) LLP**
Emma E. Jacobson (State Bar # 245951)
555 South Flower Street, 31st Floor
Los Angeles, California 90071
Telephone: +1 213 624 2500
Facsimile: +1 213 623 4581
Email: emma.jacobson@squirepb.com

Richard M. Amoroso (AZ No. 010756)
*Pro Hac Vice Application Forthcoming*
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
Telephone: +1 602 528 4000
Facsimile: +1 602 253 8129
Email: richard.amoroso@squirepb.com

Attorneys for Plaintiff,
JC HOSPITALITY, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JC HOSPITALITY LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>RIVERSTONE CAPITAL LLC, a California limited liability company; NEXGEN INSURANCE SERVICES INCORPORATED, a California corporation; NGI BROKERAGE SERVICES, INC., a California corporation; JAMES C. KELLY, an individual; TRAVIS O. BUGLI, an individual; ROBERT CLARKE, an individual; ERIK MANQUEROS, an individual; and DOES 1 – 50, inclusive,<br><br>Defendants. | Case No.<br><br>**PLAINTIFF'S COMPLAINT FOR NEGLIGENCE** |

- 1 -
COMPLAINT

Plaintiff JC Hospitality LLC ("JCH"), hereby asserts the following against Defendants Riverstone Capital LLC, Nexgen Insurance Services Incorporated, NGI Brokerage Services, Inc., James C. Kelly, Travis O. Bugli, Robert Clarke, and Erik Manqueros, and Does 1 through 50 (collectively, "Riverstone"), inclusive, and each of them, and alleges as follows:

## PARTIES

1. Plaintiff JCH is a Delaware limited liability company that is and at all relevant times to this action was a company organized and existing under the laws of the State of Delaware, and at all times relevant to this action, maintains and/or conducts its principal place of business in Las Vegas, Nevada, where it operates the Hard Rock Hotel & Casino Las Vegas.

2. Riverstone, collectively, were responsible for running, operating, and arranging for participation in a Multiple Employer Welfare Arrangement ("MEWA") through the entity Riverstone Capital, LLC ("Riverstone") and its related entities as described below.

3. Plaintiff is informed and believes and thereon alleges that Defendant James C. Kelly resides in California. Defendant Kelly is a Founding Partner, 47.5% owner, President, and Chief Executive Officer (CEO) of Riverstone. He manages the day-to-day operations of Riverstone related to recruiting and managing personnel and medical provider costs, and he serves on the Board of Directors for Riverstone.

4. Plaintiff is informed and believes and thereon alleges that Defendant Travis O. Bugli resides in California. Defendant Bugli is the Chief Operating Officer and Founding Partner of Riverstone. He has a 47.5% owner stake in Riverstone and is on the Board of Directors. He manages the everyday corporate operations and oversees accounting, sales, customer service, billing, and claims management. Defendant Bugli oversees the third party administrators (TPAs) and has discretionary authority with respect to the payment of claims payments.

///

5. Plaintiff is informed and believes and thereon alleges that Defendant Robert Clarke resides in California. Defendant Clarke is a 5% owner, President of Riverstone's Brokerage Services Division, and Partner who works with brokers to market Riverstone's services and with Riverstone's team of territorial managers who develop relationships with brokers. Clarke signs broker agreements on behalf of Riverstone and has sent information to brokers, including Plaintiff's broker, outlining Riverstone's role as plan administrator to the Participating Plans.

6. Plaintiff is informed and believes and thereon alleges that Defendant Erik Manqueros resides in California. Defendant Manqueros is the Riverstone's Executive Director and is responsible for managing its customer service division. Defendant Manqueros made decisions with Defendant Bugli as a plan administrator, and provided direction and approval on matters relating to claims approval.

7. Defendant Riverstone Capital, LLC ("Riverstone Capital") is a California limited liability company that was registered on January 28, 2014, with its principal place of business in California.

8. Nexgen Insurance Services Incorporated ("Nexgen") is a California corporation registered on January 6, 2016, with its principal place of business in California.

9. NGI Brokerage Services, Inc. ("NGI") is a California corporation registered on January 5, 2016, with its principal place of business in California.

10. Riverstone Capital, Nexgen, and NGI effectively operate as one entity, often under the name Riverstone. Each of these entities shares the same ownership, the same officers, and are headquartered in the same physical address. Riverstone Capital, Nexgen, and NGI also collectively sometimes do business under the name Riverstone Capital Insurance Services, LLC.

11. Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 50, inclusive, and therefore sues such Defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and

capacities when the same can be ascertained. Plaintiff is informed and believes and thereon alleges that each of the Defendants designated herein as Doe is in some manner — negligently or otherwise — responsible for the happenings or occurrences hereinafter set forth.

## VENUE AND JURISDICTION

12. The acts and omissions complained of in this action took place, in whole or in part, in the State of California.

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff is a Delaware limited liability company with its principal place of business in Las Vegas, Nevada, Defendants are all residents of California, or California businesses with their principal place of business in California, and the amount in controversy involves $4 million, thus exceeding the $75,000 amount in controversy requirement.

14. Venue is proper because performance was due, and/or the acts and omissions complained of took place within the venue of this Court, and/or one or more of the Defendants reside or do business within the venue of this Court.

## GENERAL ALLEGATIONS

15. Plaintiff operates the Hard Rock Hotel & Casino Las Vegas in Nevada, an international tourist destination with hundreds of employees.

16. Plaintiff is informed and believes, and based on such information and belief alleges, that Defendants, at all times relevant to this action was, were responsible for running Riverstone, which was engaged in the business of selling participation in a MEWA to businesses — among other types of coverage — looking to provide health care and medical benefits insurance coverage (hereafter "medical benefits insurance coverage") for their employees.

17. Plaintiff is informed, believes, and thereon alleges that Riverstone, including the fictitious DOE defendants, were at all relevant times acting as actual agents, ostensible agents, partners and/or joint venturers, alter egos, successors in interest, and employees of

all other Defendants, and that all acts alleged herein occurred within the course and scope of said agency, employment, partnership, joint venture, and/or enterprise, successor in interest relationship, alter ego relationship and with the express and/or implied permission, knowledge, consent, authorization and ratification of their co-defendants; however, this allegation is pleaded as an "alternative" theory wherever not doing so would result in a contradiction with other allegations.

18. Through its insurance broker Foy & Associates Insurance Services, Inc. ("Foy"), Plaintiff paid premiums to Riverstone to participate in the Riverstone MEWA.

19. Riverstone administered the MEWA run by Riverstone. In their role as administrators, Defendants commingled funds for participating employers in the MEWA, including Plaintiff, and used those funds to pay for the claims of other participating employers. Despite this commingling of funds, Defendants directed participating employers, including Plaintiff, to pay "premiums" directly into Riverstone's corporate account. Once there, Defendants commingled the premiums with the assets of all other participating employers and are not held in a trust. Once the premium is collected, Defendants exercise plenary fiduciary control over the operation of the MEWA's assets. In commingling the assets of each employer and paying claims from a generalized pool of funds, Defendants have negligently caused significant harm to Plaintiff.

20. All allegations in this complaint are based on information and belief and/or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. Whenever allegations in this complaint are contrary or inconsistent, such allegations shall be deemed alternative.

## FACTUAL ALLEGATIONS

21. Starting in or about the end of 2017, Plaintiff was in the market for medical benefits insurance coverage for its employees. At that time, Plaintiff met with Foy, and its agents, representatives, and/or employees. Foy proposed a health care and medical benefits coverage plan for Plaintiff's employees, which ultimately ended up being through Riverstone.

22. Under this medical benefits coverage plan ("Medical Plan") that was recommended and procured by Foy, Riverstone was to provide Plaintiff with, among other things, consultation advice, manage and evaluate claims, obtain and provide funding for medical payments, negotiate and acquire contracts with TPAs, and insurance carriers, and obtain separate stop-loss coverage for the Plaintiff. The Plan required Plaintiff to enter into contracts and agreements with Riverstone, HMA and S&S (the third-party administrators), medical carrier networks, Berkley Insurance (the stop-loss insurance provider), and Foy.

23. On or about November 1, 2017, Plaintiff entered an agreement participate in the Medical Plan offered by Riverstone.

24. Unbeknownst to Plaintiff, Defendants had set premiums at rates below the market for fully insured plans that provided similar coverage. Those rates were not approved by an actuary and were not actuarially sound. Defendants applied the same or similar premium rates to all employer plans without regard to relevant factors such as the size of the participating employer and its risk profile. As they did with Plaintiff, Defendants also sometimes agreed to lock in low premium rates for multiple years for certain participating employers. As such, Defendants operated the MEWA in a manner likely to result in having insufficient funds to pay claims.

25. This risk of underfunding was compounded because in addition to offering low rates without regard to risk, Defendants charged exorbitant fees. Rather than holding the plan assets it collected from participating employers in trust as required by ERISA, the Defendants had all premiums remitted to their corporate bank account and never put any of the collected premiums in a trust. Once in the corporate coffers, the Defendants skimmed 20% of the collected premiums for a "management fee" that was not disclosed nor contractually agreed upon by the employers participating in the Plan until recently. Coupled with additional fees paid to brokers and other entities, between 40-45% of all premiums collected from employers are used to pay fees, leaving only 55-60% to pay employee medical claims.

///

26. Given the low premiums and high fees, the MEWA quickly became insolvent, requiring the Department of Labor ("DOL") and the California Department of Insurance ("DOI") to begin investigating Riverstone within a year. The DOL filed a lawsuit against Riverstone and obtained a Temporary Restraining Order for multiple violations. The temporary restraining order prohibits Riverstone from exercising any authority or control with respect to the management of the program including, but not limited to, the transfer of funds from any bank accounts into which any plan assets have been deposited, and prohibits Riverstone from any further activity related to the promotion, sale, or marketing of the program.

27. Throughout the course of the Medical Plan, Riverstone rejected payment of claims that should have been approved. Defendants, and each of them, failed to monitor or take action to resolve improper rejections of claim payments as they were obligated to do.

28. Riverstone significantly delayed payments of claims.

29. Ultimately, Riverstone completely stopped payment of claims, many of which were delayed to begin with, making Plaintiff liable for said payments of claims now in excess of $4 million dollars.

30. Upon information and belief, DOL Court has now ordered the MEWA to be liquidated. Given that Riverstone "had accumulated approximately $24 million in adjudicated but unpaid claims" but only had, as of December 31, 2018, about $1 million in assets other than accounts receivable, Plaintiff will have to pay out of pocket significant amounts to cover its employees' unpaid claims. Such payments are only necessary because of Riverstone's neglect of its duties in operating the MEWA and negligence in advertising, describing, and selling the MEWA to many employers, including Plaintiff, through brokers such as Foy.

31. Compounding Riverstone's neglect of the MEWA, Riverstone also failed to acquire and pay for stop loss coverage for Plaintiff despite requesting and accepting premiums for it.

///

32. Indeed, in early 2018, Plaintiff signed up for stop loss coverage by completing a two-page application presented to them by its broker, Foy, who represented that Riverstone required the form to be completed to provide stop loss coverage through the stop loss carrier chosen by Riverstone.

33. Riverstone initially acquired stop loss coverage for Plaintiff. But in early 2018 — just months after signing up for the coverage and paying premiums for it — Riverstone neglected to remit the premiums Plaintiff had paid for the stop loss coverage to the stop loss carrier chosen by Riverstone.

34. Unbeknownst to Plaintiff, the stop loss carrier sent notifications to Riverstone notifying it that stop loss coverage for Plaintiff would be terminated unless premium payments were made.

35. Riverstone neglected to notify Plaintiff of these notices or otherwise provide Plaintiff with an opportunity to procure stop loss coverage separately, instead leading Plaintiff to believe that the stop loss coverage continued for many months.

36. In November 2018 Plaintiff learned that Berkley Accident and Life Insurance Company had terminated Plaintiff's stop loss coverage, effective in *March 2018*, purportedly for non-payment of premiums — despite that Plaintiff had timely paid all premiums, as required, to Riverstone.

37. As such, Plaintiff is left without both the primary insurance it thought it had purchased and the stop loss coverage that was meant to reduce its liability exposure in the event the MEWA failed for some reason. Thus, Defendants' negligent actions trigger the highest possible amount of harm to Plaintiff.

### FIRST CLAIM FOR RELIEF
### (Negligence)

38. Plaintiff incorporates each of the foregoing paragraphs of this complaint as if fully restated herein.

39. At all relevant times hereto, Defendant acted as operators of a MEWA, with many participating employers, nearly all of whom had purchased a plan covered by the

Employee Retirement Income Security Act ("ERISA"). As such, Defendants owed Plaintiff a duty to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, but negligently breached those duties in violation of ERISA § 404(a)(1)(B) and 29 U.S.C. § 1104(a)(1)(B).

40. Moreover, as the operator of a MEWA, Defendants owed Plaintiff a duty under California law to use reasonable care, diligence, and judgment in operating the MEWA, to avoid misrepresentations regarding the coverage provided by the MEWA, and in accepting and utilizing premium payments from Plaintiff. Defendants breached those duties by negligently operating the MEWA, failing to properly authorize and pay claims, failing to properly utilize premiums, and accepting premiums for stop loss insurance that they negligently failed to procure and pay for.

41. At all times during this relationship, Defendants negligently represented to Plaintiff that all services purportedly covered by the MEWA were adequately funded and included stop loss coverage.

42. Based on those representations, Plaintiff entered into the agreement for the Medical Plan on or about November 1, 2017.

43. Plaintiff paid all premiums due, and otherwise fully performed all conditions required of it under this agreement.

44. At all times during the relationship between Plaintiff and Defendant, Plaintiff relied on Defendant to ensure that all services performed in conjunction with the medical plan, including payments on claims, were properly and appropriately being carried out.

45. At all times during this relationship Defendants were aware that Plaintiff relied on them to ensure that all services performed by Riverstone were fair, reasonable, appropriate and in the best interests of Plaintiff.

46. Plaintiff is informed and believes, and based on such information and belief alleges, that Defendants failed to exercise the appropriate care to carry out their

responsibilities and duties to Plaintiff to use reasonable care, diligence and judgment in operating the MEWA.

47. Indeed, Defendants systematically and continuously breached their duty of care to Plaintiff.

48. Throughout the course of the Medical Plan, Riverstone rejected payment of claims, failed to process and pay claims in a timely manner, and ultimately completely stopped payment of claims, making Plaintiff liable for said payments. Defendants failed to monitor, inform, or take action to resolve or address any of these issues, as they were required to do, under their obligations and duty of care owed to Plaintiff.

49. Moreover, Riverstone failed to procure stop loss insurance coverage, despite that Riverstone charged Plaintiff for such insurance and Plaintiff paid the premiums for such coverage. Riverstone also failed to forward to Plaintiff any notice from non-party Berkley that the stop loss insurance coverage it had paid for would be terminated. Defendants failed to monitor, inform, or take action to resolve or address any of these issues, as they were required to do, under their obligations and duty of care owed to Plaintiff.

50. As a proximate result of the negligence alleged herein, on the part of Defendants, Plaintiff incurred special and general damages for an amount according to proof, well in excess of $4 million.

**WHEREFORE**, JCH prays for judgment against Defendants, and each of them, as follows:

A. For economic and special damages in excess of $4 million in an amount to be determined at trial;

B. For pre- and post-judgment interest at the maximum rate permitted by law;

C. For all costs and expenses incurred in connection with this action, including but not limited to its attorneys' fees and costs;

D. For punitive damages to Plaintiff that are reasonable under the circumstances in an amount to be determined at trial;

E. For such other and further relief as the Court deems just and proper under the circumstances.

DATED: June 7, 2019  **SQUIRE PATTON BOGGS (US) LLP**

/s/ Emma E. Jacobson

Emma E. Jacobson
Attorneys for Plaintiff
JC HOSPITALITY, LLC

- 11 -
COMPLAINT